In the

# United States Court of Appeals
## For the Seventh Circuit

---

No. 04-1687

MAKOR ISSUES & RIGHTS, LTD., *et al.*,

*Plaintiffs-Appellants*,

*v.*

TELLABS INCORPORATED, *et al.*,

*Defendants-Appellees*.

---

Appeal from the United States District Court
for the Northern District of Illinois, Eastern Division.
No. 02 C 4356—**Amy J. St. Eve**, *Judge*.

---

ARGUED NOVEMBER 1, 2007—DECIDED JANUARY 17, 2008

---

Before POSNER, WOOD, and SYKES, *Circuit Judges*.

POSNER, *Circuit Judge*. This appeal is before the court a second time, after our previous decision, 437 F.3d 588 (7th Cir. 2006), reversing the dismissal of the suit by the district court on the defendants' motion to dismiss, was itself reversed by the Supreme Court. 127 S. Ct. 2499 (2007). The Court remanded the case to us with directions to consider whether the plaintiffs' allegations of securities fraud in violation of section 10(b) of the Securities Exchange Act of 1934, 15 U.S.C. § 78j(b), and SEC Rule 10b-5, 17 C.F.R. § 240.10b-5, create the "strong inference" of scienter, as defined by the Supreme Court in its opinion,

that the Private Securities Litigation Reform Act of 1995 requires for the complaint to survive a motion to dismiss.

Rule 10b-5 forbids a company or an individual "to make any untrue statement of a material fact or to omit to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading." 17 C.F.R. § 240.10b-5(b). But liability requires proof of the defendant's "scienter," which is to say proof that he either knew the statement was false or was reckless in disregarding a substantial risk that it was false. *Higginbotham v. Baxter International, Inc.*, 495 F.3d 753, 756 (7th Cir. 2007). A popular definition of recklessness in this context is "an extreme departure from the standards of ordinary care . . . to the extent that the danger was either known to the defendant or so obvious that the defendant must have been aware of it." *In re Scholastic Corp. Securities Litigation*, 252 F.3d 63, 76 (2d Cir. 2001), quoting *Rolf v. Blyth, Eastman Dillon & Co.,* 570 F.2d 38, 47 (2d Cir. 1978). This looks like two criteria—knowledge of the risk and how big the risk is—but as a practical matter it is only one because knowledge is inferable from gravity ("the danger was either known to the defendant or so obvious that the defendant must have been aware of it"). When the facts known to a person place him on notice of a risk, he cannot ignore the facts and plead ignorance of the risk. *AMPAT/Midwest, Inc. v. Illinois Tool Works Inc.*, 896 F.2d 1035, 1042 (7th Cir. 1990); *SEC v. Jakubowski*, 150 F.3d 675, 681 (7th Cir. 1998).

A complication introduced by the Private Securities Litigation Reform Act is that "actual knowledge" of falsity, not merely indifference to the danger that a statement is false, is required for liability for "forward-looking" statements—predictions or speculations about the future.

15 U.S.C. § 78u-5(c)(1)(B)(ii); see *Helwig v. Vencor, Inc.*, 251 F.3d 540, 554-55 (6th Cir. 2001). This has implications for pleading, since the "strong inference" that must be drawn to avoid dismissal cannot be an inference merely of recklessness if predictions are challenged as fraudulent. The fact that all the statements challenged in this case that we found in our earlier opinion to be materially false are in the present tense is not decisive on the question whether the statements include predictions: "Our earnings are certain to double" is in the present tense, but is a prediction. But a mixed present/future statement is not entitled to the safe harbor with respect to the part of the statement that refers to the present. When Tellabs told the world that sales of its 5500 system were "still going strong," it was saying both that current sales were strong and that they would continue to be so, at least for a time, since the statement would be misleading if Tellabs knew that its sales were about to collapse. The element of prediction in saying that sales are "still going strong" does not entitle Tellabs to a safe harbor with regard to the statement's representation concerning current sales.

Section 21D(b)(2) of the Reform Act requires that the plaintiff's complaint "state with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind," 15 U.S.C. § 78u-4(b)(2), that is, with scienter. But except with regard to "forward-looking" statements, the Act does not specify "the required state of mind," so it remains the concept of scienter developed before the Act. *Nathenson v. Zonagen Inc.*, 267 F.3d 400, 407-09 (5th Cir. 2001); *Helwig v. Vencor, Inc.*, *supra*, 251 F.3d at 550. In our previous opinion, we ruled that the plaintiffs had adequately pleaded not only that

the defendants had made materially false statements but also that they had acted with the required scienter. The first ruling was not disturbed by the Supreme Court and is the law of the case, controlling our present consideration. The second ruling was not reversed, but the Supreme Court disagreed with this court's interpretation of "strong inference" of scienter and directed us to dismiss the complaint unless "a reasonable person would deem the inference of scienter cogent and at least as compelling as any opposing inference one could draw from the facts alleged." 127 S. Ct. at 2510 (footnote omitted). The plaintiff "must plead facts rendering an inference of scienter *at least as likely* as any plausible opposing inference." *Id*. at 2513 (emphasis in original). So first the inference must be cogent, and second it must be as cogent as the opposing inference, that is, the inference of lack of scienter.

To judges raised on notice pleading, the idea of drawing a "strong inference" from factual allegations is mysterious. Even when a plaintiff is required by Rule 9(b) to plead facts (such as the when and where of an alleged fraudulent statement), the court must treat the pleaded facts as true and "draw all reasonable inferences in favor of the plaintiff." *Borsellino v. Goldman Sachs Group, Inc.*, 477 F.3d 502, 506-07 (7th Cir. 2007). To draw a "strong inference" in favor of the plaintiff might seem to imply that the defendant had pleaded facts or presented evidence that would, by comparison with the plaintiff's allegations, enable a conclusion that the plaintiff had the stronger case; and therefore that a judge could not draw a *strong* inference in the plaintiff's favor before hearing from the defendant. But comparison is not essential, and obviously is not contemplated by the Reform Act, which requires dismissal in advance of the defendant's answer unless

the complaint itself gives rise to a strong inference of scienter. For a defendant will usually have evidence to present in his defense; and so a complaint that on its face, and without reference to the defendant's case, creates only a weak or bare inference of scienter, suggesting that the plaintiff would prevail only if there were no defense case at all, would be quite likely to fail eventually when the defendant had a chance to put on his case, which would normally be after pretrial discovery. Apparently Congress does not believe that weak complaints should put a defendant to the expense of discovery in a securities-fraud case, which is likely to be complex—as this case is.

The complaint alleges the following: The corporate defendant, Tellabs, manufactures equipment used in fiber optic cable networks; its principal customers are telephone companies. In December 2000, the beginning of the period of alleged violations of Rule 10b-5, Tellabs's principal product, accounting for more than half its sales, was a switching system called TITAN 5500. The product was almost 10 years old when on December 11 Tellabs announced that the 5500's successor product, TITAN 6500, was "available now" and that Sprint had signed a multi-year, $100 million contract to buy the 6500, though in fact no sales pursuant to the contract closed until after the period covered by the complaint. The same announcement added that despite the advent of the 6500, sales of the 5500 would continue to grow. (Most of these and other announcements quoted in the complaint were made by Richard Notebaert, who was Tellabs's chief executive officer and, along with Tellabs, is the principal defendant.)

The following month, Tellabs announced that "customers are buying more and more Tellabs equipment" and that

Tellabs had "set the stage for sustained growth" with the successful launch of several products. In February, the company told its stockholders that its growth was "robust" and that "customers are embracing" the 6500. In response to a question frequently asked by investors—whether sales of the 5500 had peaked—the company declared that "although we introduced this product nearly 10 years ago, it's still going strong." In March the company reduced its sales estimates slightly but said it was doing so because of lower than expected growth in a part of its business unrelated to the 5500 and 6500 systems, and that "interest in and demand for the 6500 continues to grow" and "we are satisfying very strong demand and growing customer demand [for the 6500, and] we are as confident as ever—that may be an understatement—about the 6500." And in response to a securities analyst's question whether Tellabs was experiencing "any weakness at all" in demand for the 5500, Notebaert responded: "No, we're not . . . . We're still seeing that product continue to maintain its growth rate; it's still experiencing strong acceptance." Yet from the outset of the period covered by the complaint Tellabs had been flooding its customers with tens of millions of dollars worth of 5500s that the customers had not requested, in order to create an illusion of demand. The company had to lease extra storage space in January and February to accommodate the large number of returns.

Just weeks after these statements Tellabs reduced its sales projections significantly because its customers were "exercising a high degree of prudence over every dollar spent." But it reiterated that the demand for the 6500 was "very strong." In April it said "we should hit our full manufacturing capacity [for the 6500] in May or June to accommodate the demand we are seeing. Every-

thing we can build, we are building and shipping. The demand is very strong."

In June, however, at the end of the period covered by the complaint, Tellabs announced a major drop in revenues, and its share price, which at its peak during the period had been $67 and in the middle of the period had varied between $30 and $38, fell to just under $16. (It currently is below $7.00.) But the deterioration had been well under way by December as a result of the bursting of the fiber-optics bubble in the middle of the year. The market for the 5500 was evaporating; the next month (January 2001), Tellabs's largest customer, Verizon, reduced its orders for the 5500 by 50 percent—having already, the previous June, reduced them by 25 percent. And not a single 6500 system was shipped during the complaint period.

Tellabs's revenues in 2001 were 35 percent lower than the year before and its profits 125 percent lower. The drop in the second quarter (most of which was within the period covered by the complaint) over the year before was even steeper; revenues dropped 43 percent and profits 211 percent.

The company's statements that we have quoted or paraphrased were, we ruled in our previous opinion—and, to repeat, the ruling binds us as law of the case—adequately pleaded as materially false. But is an inference of scienter from these allegations cogent and at least as compelling as the contrary inference—that there was no scienter? It is easier to consider the second, the comparative, question first, and also to separate the issue of the company's scienter from that of Notebaert's. The emphasis throughout the litigation has been on the latter,

but the former is also alleged and (though briefly) argued; and we begin with it.

There are two competing inferences (always assuming of course that the plaintiffs are able to prove the allegations of the complaint). One is that the company knew (or was reckless in failing to realize, but we shall not have to discuss that possibility separately) that the statements were false, and material to investors. The other is that although the statements were false and material, their falsity was the result of innocent, or at worst careless, mistakes at the executive level. Suppose a clerical worker in the company's finance department accidentally overstated the company's earnings and the erroneous figure got reported in good faith up the line to Notebaert or other senior management, who then included the figure in their public announcements. Even if senior management had been careless in failing to detect the error, there would be no corporate scienter. Intent to deceive is not a corporate attribute—though not because "collective intent" or "shared purpose" is an oxymoron. It is not. A panel of judges does not have a single mind, but if all the judges agree on the decision of a case, the decision can properly be said to represent the collective intent of the panel, though the judges who join an opinion to make it unanimous may not agree with everything said in it.

The problem with inferring a collective intent to deceive behind the act of a corporation is that the hierarchical and differentiated corporate structure makes it quite plausible that a fraud, though ordinarily a deliberate act, could be the result of a series of acts none of which was both done with scienter and imputable to the company by the doctrine of respondeat superior. Some-

one low in the corporate hierarchy might make a mistake that formed the premise of a statement made at the executive level by someone who was at worst careless in having failed to catch the mistake. A routine invocation of respondeat superior, which would impute the mistake to the corporation provided only that it was committed in the course of the employee's job rather than being "a frolic of his own," *Joel v. Morrison*, 6 C. & P. 501, 172 Eng. Rep. 1338 (1834), would, if applied to a securities fraud that requires scienter, attribute to a corporation a state of mind that none of its employees had. To establish corporate liability for a violation of Rule 10b-5 requires "look[ing] to the state of mind of the individual corporate official or officials who make or issue the statement (or order or approve it or its making or issuance, or who furnish information or language for inclusion therein, or the like) rather than generally to the collective knowledge of all the corporation's officers and employees acquired in the course of their employment." *Southland Securities Corp. v. INSpire Ins. Solutions, Inc.*, 365 F.3d 353, 366 (5th Cir. 2004) (footnote omitted). A corporation is liable for statements by employees who have apparent authority to make them. See, e.g., *American Society of Mechanical Engineers, Inc. v. Hydrolevel Corp.*, 456 U.S. 556, 568 (1982), and for the application of the principle to securities fraud *In re Atlantic Financial Management, Inc.*, 784 F.2d 29, 31-32 (1st Cir. 1986).

Suppose the false communication by the low-level employee to his superiors had been deliberate. Suppose he was embezzling tens of millions of dollars, and by concealing the embezzlement greatly exaggerated his corporation's assets. Suppose he even knew that as a result the corporation would misrepresent its assets to

investors. Nevertheless, even if his superiors were care-less in failing to detect the embezzlement, the corpora-tion would not be guilty of fraud, since the malefactor's acts of embezzling and concealing the embezzlement would not be acts on behalf of the corporation; deliberate wrongs by an employee are not imputed to his employer unless they are not only within the scope of his employ-ment but in attempted furtherance of the employer's goals. *Hunter v. Allis-Chalmers Corp.,* 797 F.2d 1417, 1421-22 (7th Cir. 1986); *Fitzgerald v. Mountain States Tel. & Tel. Co.,* 68 F.3d 1257, 1262-63 (10th Cir. 1995); *Home Life Ins. Co. v. Equitable Equipment Co.,* 680 F.2d 1056, 1059-60 (5th Cir. 1982).

The Supreme Court has declined to incorporate com-mon law principles root and branch into section 10(b) of the Securities Exchange Act (and hence into Rule 10b-5), and specifically has rejected aider and abettor liability. *Central Bank of Denver, N.A. v. First Interstate Bank of Denver, N.A.,* 511 U.S. 164 (1994). But the doctrines of respondeat superior and apparent authority remain applicable to suits for securities fraud. *AT&T v. Winback & Conserve Program, Inc.,* 42 F.3d 1421, 1429-33 (3d Cir. 1994). Tellabs does not argue the contrary.

The court in the *Southland Securities* case said that corpo-rate scienter could be based on the state of mind of some-one who furnished false information that became the basis of a fraudulent public announcement. Suppose he had knowingly supplied the false information intending to help the company. His superiors would not be liable for failing to catch the mistake, but *Southland* implies that the corporation would be liable, just as it would be in a common law tort suit. W. Page Keeton *et al.*, *Prosser and Keeton on the Law of Torts* § 70, pp. 505-06 (5th ed. 1984).

That theory of liability is not argued in this case, however, and so we need not explore it. Nor do the plaintiffs seek to use section 20(a) of the Securities Exchange Act, 15 U.S.C. § 78t(a), to impose "control person" liability on the corporation, which would require the plaintiffs to overcome defenses of good faith and noninducement. Tellabs does not make the argument, which has been rejected by most courts, that section 20(a) supersedes liability based on apparent authority or respondeat superior. *Hollinger v. Titan Capital Corp.*, 914 F.2d 1564, 1576-78 (9th Cir. 1990) (en banc); *Commerford v. Olson*, 794 F.2d 1319, 1322-23 (8th Cir. 1986); *In re Atlantic Financial Management, Inc.*, *supra*, 784 F.2d at 32-35; *Fey v. Walston & Co.*, 493 F.2d 1036, 1051-53 (7th Cir. 1974).

The critical question, therefore, is how likely it is that the allegedly false statements that we quoted earlier in this opinion were the result of merely careless mistakes at the management level based on false information fed it from below, rather than of an intent to deceive or a reckless indifference to whether the statements were misleading. It is exceedingly unlikely. The 5500 and the 6500 were Tellabs's most important products. The 5500 was described by the company as its "flagship" product and the 6500 was the 5500's heralded successor. They were to Tellabs as Windows XP and Vista are to Microsoft. That no member of the company's senior management who was involved in authorizing or making public statements about the demand for the 5500 and 6500 knew that they were false is very hard to credit, and no plausible story has yet been told by the defendants that might dispel our incredulity. The closest is the suggestion that while "available" no doubt meant to most investors that the 6500 was ready to be shipped to customers rather than that

the new product was having teething troubles that would keep it off the market for many months, this may have been a bit of corporate jargon innocently intended to indicate that the company was ready to take orders. If so, then while it was false as reasonably understood by investors the false impression was a result of mutual misunderstanding rather than of fraud. See *Banque Arabe et Internationale D'Investissement v. Maryland National Bank*, 57 F.3d 146, 153-54 (2d Cir. 1995). But this is highly implausible when "available" is set among the company's alleged lies about the 6500—that "customers are embracing" the 6500, that "interest in and demand for the 6500 continues to grow," that "we are satisfying very strong demand and growing customer demand [for the 6500 and] we are as confident as ever—that may be an understatement—about the 6500," and that "we should hit our full manufacturing capacity in May or June to accommodate the demand [for the 6500] we are seeing. Everything we can build, we are building and shipping. The demand is very strong."

Another possible, though again very unlikely, example of innocent misunderstanding is the charge of "channel stuffing." The term refers to shipping to one's distributors more of one's product than one thinks one can sell. A certain amount of channel stuffing could be innocent and might not even mislead—a seller might have a realistic hope that stuffing the channel of distribution would incite his distributors to more vigorous efforts to sell the stuff lest it pile up in inventory. Channel stuffing becomes a form of fraud only when it is used, as the complaint alleges, to book revenues on the basis of goods shipped but not really sold because the buyer can return them. They are in effect sales on consignment, and such sales "cannot be booked as revenue. Neither condition of revenue recognition has been fulfilled—ownership and

its attendant risks have not been transferred, and since the goods might not even be sold, there can be no certainty of getting paid. But those strictures haven't stopped some managers from using consigned goods to fatten the top line—that is, the revenue line—of the corporate income statement." H. David Sherman et al., *Profits You Can Trust*, *Spotting & Surviving Accounting Landmines* 30 (Financial Times Prentice Hall 2003); *SEC v. McAfee, Inc.*, Civ. Action No. 06-009 (PJH) (N.D. Cal. Jan. 4, 2006), http://sec.gov/litigation/litreleases/lr19520.htm (visited Nov. 19, 2007). (Similarly, Tellabs could not properly record revenue on its contract with Sprint before actually transferring title to 6500 systems to Sprint.) The huge number of returns of 5500 systems is evidence that the purpose of the stuffing was to conceal the disappointing demand for the product rather than to prod distributors to work harder to attract new customers, and the purpose would have been formed or ratified at the highest level of management.

All this is not to say that the plaintiffs could name "management" as a defendant or, less absurdly, name each corporate officer. That would be an example of "the group pleading doctrine[, which] is a judicial presumption that statements in group-published documents including annual reports and press releases are attributable to officers and directors who have day-to-day control or involvement in regular company operations." *Winer Family Trust v. Queen*, 503 F.3d 319, 335 (3d Cir. 2007). As we held in our first opinion, the doctrine is inconsistent with the "strong inference" requirement. 437 F.3d 588, 602-03; see also *Winer Family Trust v. Queen*, *supra*, 503 F.3d at 335-37. But it is possible to draw a strong inference of corporate scienter without being able to name the individuals

who concocted and disseminated the fraud. Suppose General Motors announced that it had sold one million SUVs in 2006, and the actual number was zero. There would be a strong inference of corporate scienter, since so dramatic an announcement would have been approved by corporate officials sufficiently knowledgeable about the company to know that the announcement was false.

Against all this the defendants argue that they could have had no motive to paint the prospects for the 5500 and 6500 systems in rosy hues because within months they acknowledged their mistakes and disclosed the true situation of the two products, and because there is no indication that Notebaert or anyone else who may have been in on the fraud profited from it financially. The argument confuses expected with realized benefits. Notebaert may have thought that there was a chance that the situation regarding the two key products would right itself. If so, the benefits of concealment might exceed the costs. Investors do not like to think they're riding a roller coaster. Prompt disclosure of the truth would have caused Tellabs's stock price to plummet, as it did when the truth came out a couple of months later. Suppose the situation had corrected itself. Still, investors would have discovered that the stock was more volatile than they thought, and risk-averse investors (who predominate) do not like volatility and so, unless it can be diversified away, demand compensation in the form of a lower price; consequently the stock might not recover to its previous level. The fact that a gamble—concealing bad news in the hope that it will be overtaken by good news—fails is not inconsistent with its having been a considered, though because of the risk a reckless, gamble. See *First Commodity Corp. of Boston v. CFTC*, 676 F.2d 1, 7-9 (1st Cir. 1982). It is

like embezzling in the hope that winning at the track will enable the embezzled funds to be replaced before they are discovered to be missing.

So the inference of corporate scienter is not only as likely as its opposite, but more likely. And is it cogent? Well, if there are only two possible inferences, and one is *much* more likely than the other, it must be cogent. Suppose a person woke up one morning with a sharp pain in his abdomen. He thought it was due to a recent operation to remove his gall bladder, but realized it could equally well have been due to any number of other things. The inference that it was due to the operation could not be thought cogent. But suppose he went to a doctor who performed tests that ruled out any cause other than the operation or a duodenal ulcer and told the patient that he was 99 percent certain that it was the operation. The plausibility of an explanation depends on the plausibility of the alternative explanations. *United States v. Beard*, 354 F.3d 691, 692-93 (7th Cir. 2004); Ronald J. Allen, "Factual Ambiguity and a Theory of Evidence," 88 *Nw. U. L. Rev.* 604, 611 (1994). As more and more alternatives to a given explanation are ruled out, the probability of that explanation's being the correct one rises. "Events that have a very low antecedent probability of occurring nevertheless do sometimes occur (the Indian Ocean tsunami, for example); and if in a particular case all the alternatives are ruled out, we can be confident that the case presents one of those instances in which the rare event did occur." *Anderson v. Griffin*, 397 F.3d 515, 521 (7th Cir. 2005). Because in our abdominal-pain example all other inferences had been ruled out except the 1 percent one, the inference that the pain was due to the operation would be cogent. This case is similar. Because the alter-

native hypotheses—either a cascade of innocent mistakes, or acts of subordinate employees, either or both resulting in a series of false statements—are far less likely than the hypothesis of scienter at the corporate level at which the statements were approved, the latter hypothesis must be considered cogent.

And at the top of the corporate pyramid sat Notebaert, the CEO. The 5500 and the 6500 were his company's key products. Almost all the false statements that we quoted emanated directly from him. Is it conceivable that he was unaware of the problems of his company's two major products and merely repeating lies fed to him by other executives of the company? It is conceivable, yes, but it is exceedingly unlikely.

The defendants complain, finally, about the complaint's dependence on "confidential sources." The 26 "confidential sources" referred to in the complaint are important sources for the allegations not only of falsity but also of scienter. Because the Reform Act requires detailed fact pleading of falsity, materiality, and scienter, the plaintiff's lawyers in securities-fraud litigation have to conduct elaborate pre-complaint investigations—and without the aid of discovery, which cannot be conducted until the complaint is filed. Unable to compel testimony from employees of the prospective defendant, the lawyers worry that they won't be able to get to first base without assuring confidentiality to the employees whom they interview, even though it is unlawful for an employer to retaliate against an employee who blows the whistle on a securities fraud, 18 U.S.C. § 1514A, and even though, since informants have no evidentiary privilege, their identity will be revealed in pretrial discovery, though of course a suit might never be brought or if

brought might be settled before any discovery was conducted.

The problem with this argument—besides the seeming flimsiness of the asserted need for anonymity—is that allegations based on anonymous informants are very difficult to assess. This concern led us to suggest in *Higginbotham v. Baxter International, Inc., supra*, 495 F.3d at 756-57, that such allegations must be steeply discounted. But that was a very different case from this one. The misconduct alleged consisted of frauds committed by Baxter's Brazilian subsidiary, but because the suit was against the parent, the plaintiffs had to show that the parent knew about the Brazilian fraud. The subsidiary had tried to conceal it from its parent as well as from the Brazilian government. There was no basis other than the confidential sources, described merely as three ex-employees of Baxter and two consultants, for a strong inference that the subsidiary had failed to conceal the fraud from its parent and thus that the management of the parent had been aware of the fraud during the period covered by the complaint.

The confidential sources listed in the complaint in this case, in contrast, are numerous and consist of persons who from the description of their jobs were in a position to know at first hand the facts to which they are prepared to testify, such as the returns of the 5500s, that sales of the 5500 were dropping off a cliff while the company pretended that demand was strong, that the 6500 was not approved by Regional Bell Operating Companies, that it was still in the beta stage and failing performance tests conducted by prospective customers, and that it was too bulky for customers' premises. The information that the confidential informants are reported to have ob-

tained is set forth in convincing detail, with some of the information, moreover, corroborated by multiple sources. It would be better were the informants named in the complaint, because it would be easier to determine whether they had been in a good position to know the facts that the complaint says they learned. But the absence of proper names does not invalidate the drawing of a strong inference from informants' assertions. See *In re Daou Systems, Inc.*, 411 F.3d 1006, 1015-16 (9th Cir. 2005); *California Public Employees' Retirement System v. Chubb Corp.*, 394 F.3d 126, 146-47 (3d Cir. 2004); *ABC Arbitrage Plaintiffs Group v. Tchuruk*, 291 F.3d 336, 353-54 (5th Cir. 2002); *Novak v. Kasaks*, 216 F.3d 300, 312-14 (2d Cir. 2000).

We conclude that the plaintiffs have succeeded, with regard to the statements identified in our previous opinion as having been adequately alleged to be false and material, in pleading scienter in conformity with the requirements of the Private Securities Litigation Reform Act. We therefore adhere to our decision to reverse the judgment of the district court dismissing the suit.

REVERSED AND REMANDED.

A true Copy:

        Teste:

_____
*Clerk of the United States Court of Appeals for the Seventh Circuit*